**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

IN THE MATTER OF THE EXTRADITION
OF MARCIN PIÓRO

Case No. 26-mj-02039-DPR

## MEMORANDUM OF LAW IN SUPPORT OF EXTRADITION

On May 18, 2026, the United States filed a complaint and obtained a warrant for the arrest of Marcin PIÓRO ("PIÓRO") based on Poland's request for extradition submitted in accordance with the extradition treaty between the United States and the Republic of Poland (the "Treaty").[1] (Doc. 1.)  In support of its request, Poland submitted the appropriate documents to the U.S. Department of State.  (Doc. 1-1.)  By statute, this Court must hold a hearing to consider the evidence of criminality presented by Poland and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention."  18 U.S.C. § 3184.

The United States respectfully submits this memorandum to set forth the procedural and factual background of the case and to explain the legal standards and protocols that govern extradition proceedings under 18 U.S.C. § 3184.  As detailed herein, the evidence submitted by Poland fulfills the relevant legal and treaty requirements.  The Court should therefore "certify the same" to the Secretary of State, who will decide whether to surrender the fugitive "according to the treaty."[2]  18 U.S.C. § 3184.

---

[1]The Extradition Treaty Between the United States of America and the Republic of Poland, U.S.-Pol., July 10, 1996, S. Treaty Doc. No. 105-14 (1997), *and* the Agreement Between the United States of America and the Republic of Poland on the application of the Extradition Treaty Between the United States of America and the Republic of Poland signed 10 July 1996, U.S.-Pol., June 9, 2006, S. Treaty Doc. No. 109-14 (2006).

[2]After the Court has completed its "limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender."  *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 829 (11th Cir. 1993).  "The Secretary exercises broad discretion and may properly consider myriad factors, including humanitarian ones, affecting both

## I.     BACKGROUND

### A.     Procedural Background

Poland seeks the extradition of PIÓRO to face prosecution for the crime of fraud, in violation of Article 286, paragraph 1, Article 294, paragraph 4, Article 12, paragraph 1, and Article 65, paragraph 1 of the Polish Criminal Code, and money laundering, in violation of Article 299, paragraphs 1 and 6, Article 306b, paragraph 1, and Article 12, paragraph 1, of the Polish Criminal Code, arising from his role as president of the management board of financial-services companies within the Conotoxia Holding Capital Group.  Specifically, PIÓRO is accused of fraudulently using and directing the use of customer deposits to finance other entities as well as his own personal life, ultimately costing more than 2,000 victim customers over approximately USD 30,000,000 in loss.

PIORO and his co-conspirators were initially charged on March 5, 2025, but the charges were supplemented to reflect additional fraud loss amounts on May 30, 2025.  On July 25, 2025, the Regional Prosecutor's Office in Poznań, Poland, issued an arrest warrant for PIÓRO on the aforementioned offenses.

PIÓRO was arrested in this district on May 19, 2026, on the basis of Poland's extradition request.  (Doc. 5.)  On May 28, 2026, a detention hearing was held and following that hearing, the Court took the United States' request that PIÓRO remain detained for the pendency of these extradition proceedings under advisement.  (Doc. 17.)  PIÓRO is currently in the custody of the U.S. Marshals Service.

---

the individual defendant as well as foreign relations, which the extradition magistrate may not." *Id.*

### B. Factual Background

The extradition request sets forth the following sets of facts for the Polish criminal charges upon which PIÓRO's extradition is based.

#### 1. Overview of PIÓRO Conduct

According to the materials submitted by Poland, PIÓRO orchestrated and directed a multi-year scheme to misappropriate customer funds deposited in digital currency wallets and accounts maintained by Cinkciarz.pl, an online currency exchange, and Conotoxia, a domestic payment institution. As president of the management boards of these companies, PIÓRO is accused of authorizing the diversion and use of customer deposits — funds that, under Polish law, could be used only for customer currency exchanges or customer withdrawals — for:

• Operating expenses of the companies,

• "Loans" to numerous related entities within the Conotoxia corporate group, including foreign subsidiaries,

• His own personal expenses, and

• Transfers to his personal bank accounts, including accounts in the United States.

The misuse of customer funds resulted in more than 2,000 victims and losses exceeding USD $30 million.

#### 2. Corporate Structure and Roles

The Conotoxia Holding Capital Group (the "Group") consisted of multiple subsidiary and foreign companies, including Cinkciarz.pl, Conotoxia, Conotoxia Holding USA, and Conotoxia Holding Cyprus. Cinkciarz.pl operated as an online currency exchange with digital currency wallets that customers could fund and withdraw from at will. Under Polish law, such funds could not be used for any purpose other than customer transactions. Conotoxia operated as a domestic

3

payment institution and was the only entity in the Group legally authorized to provide payment services.

PIÓRO served as the president of the management board of Cinkciarz.pl from September 2010, to at least October 2024. From February 2014, he also held various positions on the management board of Conotoxia, including the role of president from February 2014, until November 2020, and again beginning on October 22, 2024. In these roles, he exercised managerial authority over the Group's financial operations.

3.      <u>Polish Authorities' Investigation</u>

In August 2024, the Polish Financial Supervision Authority ("the Authority") notified prosecutors of suspected criminal activity involving Contoxia and Cinkciarz.pls' unauthorized use of customer funds, misleading reporting, and false accounting data.

Polish Authorities discovered:

• Customer funds were diverted as early as 2020 to support the operations of Group companies.

• "Loan agreements" were executed to disguise internal transfers, including approximately PLN 6.7 million (approximately USD 1.6 million) loaned from Cinkciarz.pl to Conotoxia in 2023.

• Funds were regularly routed through Conotoxia Holding and then transferred to foreign subsidiaries, including those in Cyprus and the United States.

Customer complaints escalated during July–August 2024, with reports of delayed or unfulfilled currency-exchange transactions, ultimately culminating in several thousand failed customer withdrawals between October–December 2024 due to insufficient funds. Yet, the online platform continued to operate, accepting funds from customers.

Prosecutors executed searches of corporate offices and residences, including PIÓRO's, between October 24–28, 2024, seizing documents and data and interviewing key employees.

4

4. <u>Witness Statements Implicating PIÓRO</u>

Polish investigators interviewed numerous professionals involved in the operation of the Group, including:

• An outside auditor who found unjustified bonus payments and loans to PIÓRO totaling PLN 44.6 million (roughly USD 11.7 million) and warned him as early as 2019 that customer funds were insufficient to meet liabilities.

• Chief accountant Monika Jakubowska, who admitted her role in the scheme and identified customer funds as the primary financing mechanism for the Group's operations since the beginning of its business. She stated that PIÓRO:

– Directed all loan amounts,
– Knew customer funds were insufficient, and
– Used corporate accounts for personal luxury expenditures.

• Financial controller Katarzyna Hołowiak Pidłypczak, who confirmed that PIÓRO was the key decision maker for all companies in the Group, including on financial and business decisions. She reported that PIÓRO asserted that customer funds were merely "advances" no longer belonging to customers and could be "freely disposed of."

• Co-conspirator Robert Górny, former president of Conotoxia, who corroborated that PIÓRO exercised final control over the misuse of customer funds and had access to all customer databases.

5. <u>Fraud Losses (Count I)</u>

In the course of its investigation into Conotoxia Holding Capital Group and its subsidiaries, Polish authorities received approximately 7,000 complaints from the public. The investigation is ongoing, and, as of the submission of the extradition request in September 2025, Polish authorities had interviewed at least 900 witnesses.

According to Polish authorities, between 2020 and December 19, 2024, PIÓRO and his co-conspirators defrauded at least 2,396 people by inducing them to place money into mobile wallets controlled by these companies, on the promise that the funds would remain available to them. Instead, PIÓRO and his co-conspirators used the funds to grant loans to other entities and repay earlier financial obligations. The misuse of customer funds resulted in insufficient funds in

5

customer wallets, for total losses to customers of USD 30,144,256.90[3] across at least 16 currencies (so far), as charged in Count I of the Polish charging document.

6. <u>Money Laundering (Count II)</u>

After it became clear that Cinkciarz.pl no longer possessed sufficient funds to cover transactions requested by its customers, after numerous customer complaints, and even after the Authority withdrew Conotoxia's permission to provide payment services, PIÓRO continued to direct the transfer of funds from Cinkciarz.pl to foreign entities and to his personal accounts. Investigators documented the following transactions in the period from October 7, 2024, through December 5, 2024, which form the basis of Count II, charging PIÓRO and others with concealing, converting, and transferring customer funds to be used as loans, to meet other obligations, or to pay themselves:

a. On October 7, 2024, PLN 200,000 (approximately USD 50,000) was transferred from Cinkciarz.pl to a Conotoxia Holding account as a "granted loan."

b. The same day, October 7, 2024, USD 241,000 was transferred from a Cinkciarz.pl account used for customer services purposes, to a personal bank account of PIÓRO held in the United States.

c. In the period from October 1-25, 2024, a total of USD 610,000 was transferred from a Cinkciarz.pl account to a Conotoxia Holding account as a "loan agreement," and then to a Conotoxia Holding Inc. account in the United States titled "loan agreement."

d. On October 28, 2024, EUR 80,000 (approximately USD 86,500) was transferred from a Cinkciarz.pl account to a Conotoxia Holding account, and then to a Conotoxia Holding Ltd. Cyprus account titled "share capital increase."

e. On November 28, 2024, EUR 185,000 (approximately USD 195,500) was transferred from a Conotoxia account to a Conotoxia Holding account as "loan agreement," and then from that account to a Conotoxia Holding account in Cyprus, titled "share capital increase."

---

[3]Conversions calculated based on the exchange rate to the USD on December 19, 2024.

6

f.  On December 5, 2024, PLN 420,000 (approximately USD 103,000) was transferred from a Conotoxia account to a Conotoxia Holding account as a "concluded loan agreement."

g.  The same day, December 5, 2024, USD 300,000 was transferred from a Conotoxia account to an account held for Conotoxia Holding Cyprus, as a "loan agreement."

In total, nearly USD 2 million in transactions during October–December 2024, support Count II (money laundering).

7.  PIÓRO's Efforts to Hide Assets and Avoid Arrest

Three days after Polish authorities withdrew Conotoxia's permission to operate as a domestic payment institution, PIÓRO made notable financial transactions in an apparent effort to hide assets. First, PIÓRO transferred three of his properties with a total value of PLN 5,000,000 (USD 1,346,950.00) to his father as a "donation." In another flagged "donation," PIÓRO transferred shares in Cinkciarz Marketing and Conotoxia Holding, among other shares, to Nextgen Growth Family Foundation. PIÓRO is the founder and sole beneficiary of the Nextgen Growth Family Foundation.

In the last outgoing transfer from his own currency wallet, registered on October 7, 2024, PIÓRO transferred roughly USD 233,000 to a personal account located in the United States.

To date, Polish authorities have uncovered payments from 2020-2024 totaling PLN 51,294,361 (USD 13,818,121.23) to PIÓRO's bank accounts from Cinkciarz.pl, Conotoxia, Cinkciarz Marketing, Biscreen Defense, and Conotoxia Holding Ltd. for the purposes of "remuneration," "granting of loans," and "advances for expenses." There is no record of repayment for at least PLN 11,413,000 (USD 3,074,533.23) of the transfers.

PIÓRO fled Poland in October 2024. Multiple witnesses informed Polish authorities that PIÓRO left for fear of being detained by police. Jakubowska said that PIÓRO offered to help her

7

flee abroad as well, but she declined the offer. PIÓRO entered the United States from Zurich on January 4, 2025.

## II.    DISCUSSION

### A.    General Principles of Extradition

Extradition is primarily an executive responsibility with a specially defined role for a judicial officer, who is authorized by statute to determine whether to certify to the Secretary of State that the submitted evidence is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see also United States v. Wiebe*, 733 F.2d 549, 553 (8th Cir. 1984). That judicial function is carried out by conducting a hearing pursuant to 18 U.S.C. § 3184. At the hearing, the Court should consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification, as defined in the treaty, statutes, and case law, have been established. *See Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981) (summarizing extradition procedure); *see also Wiebe,* 733 F.2d at 553 (citing *Collins v. Loisel*, 259 U.S. 309, 315 (1922)). If any evidence is offered by the fugitive, the Court rules on its admissibility. Once the evidentiary record is complete, the Court should make written findings of fact and conclusions of law as to each of the elements for certification, including separate findings for each offense as to which extradition is sought. *Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir. 1973). Once the Court issues its certification, the Secretary of State then decides whether to surrender the fugitive to the requesting country. 18 U.S.C. §§ 3184, 3186; *Matter of Extradition of Sutton*, 905 F. Supp. 631, 636 (E.D. Mo. 1995) ("Historically, once the judge has certified his findings, the Secretary of State has conducted an independent review of the case to determine whether to issue a warrant of surrender to the requesting nation.").

8

In fulfilling its function under Section 3184, a judge should liberally construe the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 14 (1936); *Factor v. Laubenheimer*, 290 U.S. 276, 301 (1933). Accordingly, the treaty "should be construed more liberally than a criminal statute or the technical requirements of criminal procedure." *Factor*, 290 U.S. at 298. The United States does not expect foreign governments to be versed in our criminal laws and procedures. *Grin v. Shine*, 187 U.S. 181, 184 (1902). Thus, "[f]orm is not to be insisted upon beyond the requirements of safety and justice." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925).

**B.      The Requirements for Certification Are Satisfied**

A court must certify a fugitive as extraditable where: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the applicable treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought. *See, e.g.*, *Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008). Each of the elements has been met in this case.

1.      This Court Has Authority Over the Proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. Consequently, both magistrate judges and district judges may render a "certification" under Section 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993). This Court is therefore authorized to conduct the hearing in this case.

9

2.     This Court Has Jurisdiction Over PIÓRO

This Court has jurisdiction over a fugitive found within its jurisdictional boundaries. 18 U.S.C. § 3184 (a court "may, upon complaint made under oath, charging any person found within [its] jurisdiction, … issue [its] warrant for the apprehension of the person so charged"); *Pettit v. Walshe*, 194 U.S. 205, 219 (1904); *Grin*, 187 U.S. at 185-86. The arrest warrant pertaining to Poland's request for PIÓRO's extradition was executed while PIÓRO was in Fort Leonard Wood, Missouri. Therefore, this Court has jurisdiction over him.

3.     The Relevant Treaty Is in Full Force and Effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See* 18 U.S.C. § 3184. In this case, Laura Gault, Attorney Adviser in the Office of the Legal Adviser for the Department of State, has provided a declaration attesting that the extradition treaty between the United States and Poland is in full force and effect. (Doc. 1-1 at EXT-PIORO-00001.) The Court must defer to the Department of State's determination in this regard. *See*, *e.g.*, *Kastnerova v. United States*, 365 F.3d 980, 986 (11th Cir. 2004) ("[E]very other Court of Appeals to consider whether a treaty has lapsed has deferred to the Executive's determination."), *cert. denied*, 541 U.S. 1090 (2004); *Terlinden v. Ames*, 184 U.S. 270, 285 (1902) (stating that when resolving the question of whether an extradition treaty between two countries has been terminated, the actions of the respective governments are controlling).

4.     The Charged Crimes Are Covered by the Treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. *See Ramanauskas v. United States*, 526 F.3d 1111, 1114 (8th Cir. 2008) (quoting *Wiebe*, 733 F.2d at 554) ("The purpose of extradition treaties is "the

10

surrender of fugitives to be tried for their alleged offenses."). Article 1 of the U.S.-Poland extradition treaty provides for the return of fugitives who have been charged with or convicted of an extraditable offense. (Doc 1-1 at EXT-PIORO-00012.) Article 2 of the Treaty defines offenses as extraditable if the alleged conduct is punishable under the laws of both the United States and Poland by "deprivation of liberty for a maximum period of more than one year or by a more severe penalty." *Id.*

In assessing whether the crime for which extradition is requested is covered by the Treaty, the Court examines the description of criminal conduct provided by Poland in support of its charge and decide whether that conduct would constitute an offense that is punishable by at least one year imprisonment under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See*, *e.g.*, *DeSilva v. DiLeonardi*, 125 F.3d 1110, 1114 (7th Cir. 1997); *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107-08 (9th Cir. 1981); *Peters v. Egnor*, 888 F.2d 713, 719 (10th Cir. 1989); *see also Graham v. Young*, 886 F.3d 700, 701 (8th Cir 2018) (quoting *Murphy v. United States*, 199 F.3d 599, 602 (2d Cir. 1999)) ("an accused can be extradited only if the alleged criminal conduct is considered criminal under the laws of both the surrendering *and* requesting nations."). A requesting country need not establish that its crimes are identical to ours. *E.g.*, *Ross v. United States Marshal,* 168 F.3d 1190, 1196 (10th Cir. 1999); *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998) ("The primary focus of dual criminality has always been on the conduct charged; the elements of the analogous offenses need not be identical."). Rather, "the court looks at whether 'the essential character of the transaction is the same and made criminal by both statutes.'" *United States v. Knotek*, 925 F.3d 1118, 1131 (9th Cir. 2019) (quoting *Wright v. Henkel*, 190 U.S. 40, 62 (1903) (brackets omitted)). Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be

11

the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).  Further, in determining whether the conduct constitutes an extraditable offense, "a narrow and restricted construction is to be avoided . . . [and] if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." *Factor*, 290 U.S. at 293-94.

The offenses for which PIÓRO's extradition is sought—fraud, in violation of Article 286, paragraph 1, Article 294, paragraph 4, Article 12, paragraph 1, and Article 65, paragraph 1 of the Polish Criminal Code, and money laundering, in violation of Article 299, paragraphs 1 and 6, Article 306b, paragraph 1, and Article 12, paragraph 1, of the Polish Criminal Code—are covered by Article 2 of the Treaty.  *First*, as set forth in the extradition request, both Polish offenses are punishable in Poland by terms of imprisonment exceeding one year.  (Doc. 1-1 at EXT-PIORO-00104 (Article 286 - Fraud punishable by imprisonment of 6 months to 8 years), EXT-PIORO-00105 (Article 299 - Money Laundering punishable by imprisonment of 6 months to 8 years).)[4] *Second*, the conduct underlying Poland's charges would be sufficiently punishable had it been committed in the United States.  Specifically, the alleged conduct underlying Count I — that PIÓRO fraudulently used and directed the use of customer deposits to finance other entities as well as his own personal life, ultimately costing more than 2,000 victim customers over approximately USD 30,000,000 in loss — could have been charged as wire fraud pursuant to 18 U.S.C. 1343,

---

[4]The Polish charges include references to statutes that increase the penalties applicable here.  For Count I, Article 294 increases the possible penalty range to a range of 5 to of 25 years based on the value of the property subject to the fraud.  For Count II, Article 299, Paragraph 6, increases the possible penalty range from one year to a maximum of 10 years based on the significant financial benefit achieved by the perpetrator.

which carries penalties up to twenty (20) years' imprisonment.  For the alleged conduct underlying Count II - that PIÓRO took actions aimed at preventing or significantly impeding the seizure of money derived from the fraud articulated in Count I by concealing, converting, and transferring customer funds to be used as loans, to meet other obligations, or to pay themselves (on specific dates from October through December 2024, as set out in the charging document), he could have been charged with money laundering under  18 U.S.C. § 1956(a)(1)(B), which carries a penalty of up to twenty years' imprisonment.  Accordingly, the crimes for which PIÓRO's extradition is sought are encompassed by the Treaty.

> 5.  <u>The Evidence Establishes Probable Cause that PIÓRO Committed the Offenses for which Extradition Is Sought</u>

The standard of proof to find the evidence "sufficient to sustain the charge . . ." pursuant to Section 3184 is the familiar domestic requirement of probable cause.  To this end, the court must conclude there is probable cause to believe that the crimes charged by Poland were committed by the person before the court.  *See Wiebe*, 733 F.2d at 553 (internal citations omitted); *see also* Treaty, Art. 10(1), Ex. 1 at 14.  The evidence is sufficient, and probable cause is established, if a person of ordinary prudence and caution can conscientiously entertain a reasonable belief in the probable guilt of the accused.  *E.g.*, *Illinois v. Gates*, 462 U.S. 213, 231 (1983); *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975).  The extradition judge's probable cause determination is "'not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'"  *Quinn*, 783 F.2d at 791 (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 (9th Cir. 1981)).

The evidence provided by Poland in support of its request for PIÓRO's extradition establishes probable cause that he committed the charged offenses — Fraud, in violation of Article

13

286, paragraph 1, Article 294, paragraph 4, Article 12, paragraph 1, and Article 65, paragraph 1 of the Polish Criminal Code, and Money Laundering, in violation of Article 299, paragraphs 1 and 6, Article 306b, paragraph 1, and Article 12, paragraph 1, of the Polish Criminal Code. Specifically, the extradition request contains detailed charging documents and decisions from Polish authorities outlining the evidence supporting each of the charges. This evidence includes victim complaints establishing misrepresentation and loss of funds, examination and analysis of bank records revealing the unlawful transfer of customer funds in furtherance of (and later to conceal), the fraud, as well as interviews of professionals - both inside and outside the organization - including an outside auditor, financial controller and chief accountant - all of whom implicate PIÓRO. As described below, these Polish documents provide sufficient evidence that PIÓRO committed the offenses for which his extradition is sought.

      **C.**     **The Documentary Evidence Submitted by Poland Is Alone Sufficient for Certification**

The extradition hearing prescribed by 18 U.S.C. § 3184 is unique and limited in its nature. *See, e.g.*, *Martin*, 993 F.2d at 828. Unlike a criminal proceeding, its purpose is to decide the sufficiency of the charge under the treaty, not guilt or innocence — that is for the foreign court. *Collins v. Loisel*, 259 U.S. 309, 316 (1922); *Neely v. Henkel*, 180 U.S. 109, 123 (1901); *Wiebe*, 733 F.2d at 553. Accordingly, an extradition hearing is not a criminal proceeding. *See, e.g.*, *Martin*, 993 F.2d at 828. Rather, it is "an administrative proceeding arising under international law for certification and approval of the State Department's decision to extradite this person at the request of a foreign government," *In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1284 (S.D. Fla. 2017), and it is governed by "the general extradition law of the United States and the provisions of the Treaty," *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987).

14

Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition hearings. *See* Fed. R. Crim. P. 1(a)(5) (stating that "extradition and rendition of a fugitive" are not governed by rules); Fed. R. Evid. 1101(d)(3) (evidence rules are inapplicable to "miscellaneous proceedings such as . . . extradition or rendition"); *see also Afanasjev v. Hurlburt,* 418 F.3d 1159, 1164-65 (11th Cir. 2005). Rather, "unique rules of wide latitude govern reception of evidence" in extradition hearings. *Sayne v. Shipley*, 418 F.2d 679, 685 (5th Cir. 1969) (citation and internal quotation marks omitted). Among these rules are the following:

1. <u>Written Submissions Are Sufficient; No Live Witnesses Are Required</u>

Extradition treaties do not contemplate the introduction of live witness testimony at extradition proceedings because to do so "would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916). Rather, pursuant to 18 U.S.C. § 3190, documents transmitted by the country requesting extradition "shall be received and admitted as evidence" so long as they are "properly and legally authenticated," as confirmed by "the principal diplomatic or consular officer of the United States resident in such foreign country." 18 U.S.C. § 3190. The documents filed in this case meet the requirements of Section 3190 because they are accompanied by a certification of The Minister of Justice in Warsaw, Poland attesting to the documents' authentication. (Doc. 1-1 at EXT-PIORO-00025-26 and EXT-PIORO-00002 (State Department declaration noting that the documents supporting Poland's extradition request are properly certified in accordance with Section 3190).)

Thus, hearsay evidence is admissible at extradition hearings and may properly support a finding of extraditability. *See Bingham*, 241 U.S. at 517 (rejecting fugitive's claim that *ex parte* witness affidavits submitted in support of his extradition to Canada should not be considered because he had not had the opportunity to cross-examine those witnesses); *see also United States*

15

*v. Zanazanian*, 729 F.2d 624, 626-27 (9th Cir. 1980) (unsworn written statements may properly form the basis for extradition); *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir. 1980) (same). Accordingly, a finding of extraditability may be, and typically is, based entirely on the authenticated documentary evidence and information provided by the requesting government. *See, e.g., Collins*, 259 U.S. at 317; *Bovio v. United States*, 989 F.2d 255, 259-61 (7th Cir. 1993); *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986).

       2.       <u>Limitations on the Fugitive's Evidence</u>

PIÓRO's opportunity to challenge the evidence introduced against him is heavily circumscribed. He may not introduce evidence that contradicts the evidence submitted on behalf of Poland, attempt to establish an alibi, or present a defense. *See Charlton v. Kelly*, 229 U.S. 447, 461 (1913); *see also Collins*, 259 U.S. at 316. Moreover, procedural defenses are not permitted. *See Bingham*, 241 U.S. at 517; *Glucksman v. Henkel*, 221 U.S. 508, 513-14 (1911) (variance between charges pending in the foreign country and the complaint filed in federal court is not a valid defense to surrender).

Instead, a fugitive's right to controvert the evidence introduced against him is "limited to testimony which explains rather than contradicts the demanding country's proof" and that which "completely obliterates probable cause." *United States ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963); *see also Collins*, 259 U.S. at 315-17; *Barapind v. Enomoto*, 400 F.3d 744, 749 (9th Cir. 2005) (*en banc*). This allowance of "explanatory evidence" and prohibition on "contradictory evidence" is rooted in the fact that an extradition judge may not weigh conflicting evidence and determine what to credit, "but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." *Quinn*, 783

16

F.2d at 815. Issues requiring factual or credibility determinations are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

       3.    <u>Rule of Non-Inquiry: Matters Other Than Sufficiency of the Evidence Are Generally Left to the Secretary of State</u>

Other than the sufficiency of the evidence, all matters that may be raised by the fugitive as defenses to extradition are to be considered by the Secretary of State, not by the Court. *See* 18 U.S.C. §§ 3184, 3186. In making extradition determinations, "[t]he Secretary exercises broad discretion and may properly consider factors affecting both the individual defendant as well as foreign relations—factors that may be beyond the scope of the magistrate judge's review." *Sidali v. Immigration & Naturalization Svc.*, 107 F.3d 191, 195 n.7 (3d Cir. 1997); *see also Arias v. Warden*, 928 F.3d 1281, 1286 (11th Cir. 2019) ("[The Secretary of State] may properly consider myriad factors affecting both the individual defendant as well as foreign relations—which the Judicial Branch may not."). The Secretary takes into account humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the receiving country. *See Ntakirutimana v. Reno*, 184 F.3d 419, 430 (5th Cir. 1999). This is consistent with the long-held understanding that surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State," within the Executive's "powers to conduct foreign affairs." *See In re Kaine*, 55 U.S. 103, 110 (1852).

## III.    **CONCLUSION**

For the reasons set forth herein, the United States requests that the Court conduct a hearing pursuant to 18 U.S.C. § 3184 to determine that the submission on behalf of Poland is sufficient to

sustain the charges under the provisions of the applicable treaty and to certify the extradition of

PIÓRO for those charges to the Secretary of State for possible surrender to Poland.

Respectfully submitted,

R. Matthew Price
United States Attorney

By   /s/ Bradley K. Kavanaugh

Bradley K. Kavanaugh
Assistant United States Attorney
VICDTR – HSTF
Charles Evans Whittaker Courthouse
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106
Telephone: (816) 426-3122

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on June 2, 2026, to the CM-ECF system of the United States District Court for the Western District of Missouri.

/s/ Bradley K. Kavanaugh
Bradley K. Kavanaugh
Assistant United States Attorney

18